**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAN HARDWAY *et al.*,

       *Plaintiffs*,

   v.

CENTRAL INTELLIGENCE AGENCY,

       *Defendant*.

Civil Action No. 17-1433 (TJK)

## <u>MEMORANDUM OPINION</u>

Plaintiffs Dan Hardway, Edwin Lopez, and G. Robert Blakey worked for a congressional committee in the 1970s that investigated the assassinations of President John F. Kennedy and Dr. Martin Luther King, Jr.  They suspected that the Central Intelligence Agency (CIA) was interfering with their investigation and spying on them.  About forty years later, they sought to confirm those suspicions by requesting records from the CIA under the Freedom of Information Act (FOIA).  Dissatisfied with the CIA's response, they sued, challenging the adequacy of the CIA's searches and its decision to redact its employees' names from the two documents it released to them.  After the parties moved for summary judgment, the Court granted the CIA's motion as to one portion of the search (and related redactions) but denied both motions in all other respects.  The parties have now filed renewed motions for summary judgment.  For the reasons explained below, the Court will grant the CIA's motion and deny Plaintiffs' cross-motion.

## I.   Background

The Court assumes familiarity with the facts of this case as reflected in its prior opinion, *Hardway v. Central Intelligence Agency*, 384 F. Supp. 3d 67 (D.D.C. 2019).  In May 2017,

Plaintiffs submitted a FOIA request to the CIA for eight types of records.  *See* ECF No. 1-1 at 1.

These were:

A.  All "201" files, records, information, or materials, including "soft files," pertaining to Dan L. Hardway, Edwin Lopez, and/or G. Robert Blakey.  This includes, but is not limited to, covert, as well as overt, 201 files and counterintelligence files, records, information or materials related to or referring to Dan L. Hardway, Ed Lopez and/or G. Robert Blakey.

B.  All "P" files, records, information or materials, including, but not limited to "soft" files, related to or referring to Dan Hardway, Ed Lopez, and/or G. Robert Blakey.

C.  Any and all files, records, information or materials of the Office of Security related to or referring to Dan L. Hardway, Ed Lopez and/or G. Robert Blakey.

D.  Any and all files, records, information or materials related or referring to surveillance of Dan L. Hardway, Ed Lopez and/or G. Robert Blakey, wherever that surveillance may have occurred, including, but not limited to, Mexico, Cuba and the United States and including both surveillance conducted by or on behalf of the Central Intelligence Agency or any other agency of the United States, or any agency of any foreign country, and reported to the Central Intelligence Agency, including, but not limited to, surveillance of any interaction between Dan L. Hardway, Ed Lopez, Gaeton Fonzi, and/or G. Robert Blakey, and members or representatives of the Cuban Interest Section, or other representatives of the Cuban government. . . .

E.  Any and all files, records, information or materials generated in, relating to or referencing, the years 1976 through 1979 between the CIA and any representative of a foreign government, including but not limited to a foreign government's intelligence, counterintelligence, law enforcement, judicial or police authorities, or a representative of any foreign news interest which (a) relate to or reference Dan L. Hardway, Ed Lopez and/or G. Robert Blakey, or (b) relate to or reference any activity of the House Select Committee on Assassinations (HSCA) and any staff member of the HSCA, including but not limited to Dan L. Hardway, Ed Lopez and/or G. Robert Blakey, including but not limited to HSCA staff trips to, and activities while in, Mexico and Cuba.

F.  Any and all psychological profiles of, about, on, by, or referring to Dan L. Hardway, Ed Lopez, Gaeton Fonzi, and/or G. Robert Blakey, including any and all files, records, information and materials pertaining to any dissemination thereof.

G.  Any and all operational files, non-operational files, records, information or materials, including but not limited to Counterintelligence (CI) and autonomous operations, regarding operations aimed at, targeting, related to or referring to

the HSCA and any member of the HSCA or its staff, including but not limited to Dan L. Hardway, Ed Lopez, Gaeton Fonzi, and/or G. Robert Blakey.

H.  Copies of all search slips, search instructions, routing slips or routing forms, search memoranda, letters, telephone messages, emails or any other form of written or recorded communication in any format whatsoever regarding the searches conducted in response to this request or any other request for information responsive to requests denominated A through G above.

*Id.* at 1–3.  Having received no response, Plaintiffs filed this suit.  ECF No. 1 ("Compl.") ¶ 13.

The CIA grouped Plaintiffs' requests into four categories, based on where it determined responsive records might be located: (1) records within the Office of Security; (2) records within the Directorate of Operations; (3) personnel records; and (4) records related to its searches for records in the previous three categories.  *Hardway*, 384 F. Supp. 3d at 74.  The CIA ultimately released two records to Plaintiffs: non-disclosure agreements signed by Blakey during his work for the HSCA in the 1970s.  *Id.*

After the parties moved for summary judgment, the Court found that the CIA had properly searched for records within the Office of Security and properly redacted the documents it had produced, and it granted summary judgment for the CIA on those aspects of Plaintiffs' claims.  *Id.* at 80.  But it denied summary judgment as to the adequacy of the CIA's searches related to the other three categories.  *Id.*  The parties have now filed renewed motions for summary judgment on the remaining issues.  *See* ECF No. 25; ECF No. 27.  In support of its motion and to remedy the deficiencies noted by the Court in its prior opinion, the CIA has submitted two supplemental declarations by Antoinette Shiner, an Information Review Officer for the CIA's Litigation Information Review Office.  ECF No. 25-3 ("Second Supp'l Shiner Decl."); ECF No. 28-2 ("Third Supp'l Shiner Decl.").

## II.     Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing a motion for summary judgment under the FOIA, the district court conducts a *de novo* review of the record." *Tokar v. U.S. Dep't of Justice*, 304 F. Supp. 3d 81, 89 (D.D.C. 2018) (citing 5 U.S.C. § 552(a)(4)(B)).

FOIA requires that an agency search for and disclose requested records unless they fall within one of nine exemptions. *See* 5 U.S.C. § 552. The agency is entitled to summary judgment on the adequacy of its search if it shows "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990). The agency can make this showing through an affidavit "setting forth the search terms and the type of search performed, and averring that all records likely to contain responsive materials (if such records exist) were searched." *Id.* "Agency affidavits—so long as they are relatively detailed and non-conclusory—are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). Still, an agency must submit more than "vague, conclusory affidavits, or those that merely paraphrase the words of a statute," to allow the Court to review the agency's search efforts. *See Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d 784, 787 (D.C. Cir. 1980).

This Circuit "applies a reasonableness standard to determine whether an agency performed an adequate search." *Mobley*, 806 F.3d at 580. The Court's inquiry turns on methods, not results. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)

("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.").

In deciding what physical and electronic locations to search for responsive records, an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68. It must, "[a]t the very least, . . . explain in its affidavit that no other record system was likely to produce responsive documents." *Id.* Beyond the locations searched, an agency must explain its search methods and the terms used. *Reporters Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 403 (D.C. Cir. 2017); *see also Rodriguez v. Dep't of Defense*, 236 F. Supp. 3d 26, 38 (D.D.C. 2017) ("At a bare minimum, the agency's affidavits need to specify 'what records were searched, by whom, and through what process.'" (quoting *Steinberg v. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994))).

## III.   Analysis

### A.   Directorate of Operations Records

The Court previously held that the CIA's declarations about its search of the Directorate of Operations—where the CIA determined that "201" records, surveillance records, records related to communications with foreign governments, psychological profiles, and counterintelligence records (Plaintiffs' Requests A, D, E, F, and G) would likely be located— were insufficiently detailed to allow the Court to determine whether it had conducted an adequate search. *Hardway*, 384 F. Supp. 3d at 78. In particular, Shiner's original declarations were lacking in two respects: first, they did not explain whether any records systems other than the one searched were reasonably likely to contain responsive documents, and second, they did not sufficiently describe how the agency searched its nonoperational files. *Id.*

Shiner's new declarations cure these deficiencies. First, she clarifies that "experienced CIA information management professionals" identified and searched "a particular system of

records maintained by the Directorate of Operations that was reasonably likely to contain responsive records" to Plaintiffs' Requests A, D, E, F, and G (if any such records existed) and that "no other record systems were reasonably likely to contain responsive records."  Second Supp'l Shiner Decl. ¶¶ 11–13.  She also explains that this records system, an electronic database, contains both operational and nonoperational files.  *Id.* ¶ 13.  Thus, the CIA searched nonoperational records in the Directorate of Operations in substantially the same way it searched for operational records.  *Id.*  For both operational and nonoperational records about Plaintiffs, the CIA queried its database with variations on the Plaintiffs' names, standing alone and close to "HSCA" or "House Select Committee on Assassinations," and for any other potentially responsive nonoperational records, it also queried the database with the name Gaeton Fonzi, as well as the terms "HSCA," and "House Select Committee on Assassinations."[1]  *See id.*; Third Supp'l Shiner Decl. ¶ 2; ECF No. 15-3 ¶¶ 17–19; ECF No. 19-1 ¶ 12.  Shiner explains that because these terms would identify all extant references to Plaintiffs and Fonzi, the CIA's search cast a broader net than Plaintiffs' request, and any documents responsive to their request within the Directorate of Operations would have been captured by this search.  *See* Second Supp'l Shiner Decl. ¶ 13.

In summary, in its renewed motion the CIA has: (1) asserted that no records system other than the database searched was reasonably likely to contain responsive documents; (2) clarified that it searched for nonoperational files in the database in substantially the same way it searched for operational files, since both were located there; and (3) explained the search terms it used to

---

[1] The CIA's search of its operational records was limited to those about Plaintiffs because by statute, it may exclude operational records from its searches unless U.S. citizens "have requested information on themselves," 50 U.S.C. § 3141(a), (c)(1).

electronically search the nonoperational files in that database.  It has thus filled the gaps left open in its prior motion for summary judgment.  *See Hardway*, 384 F. Supp. 3d at 78.

Plaintiffs raise several challenges to the CIA's representations.  First, they argue that Shiner's second supplemental declaration, in which she clarifies that the Directorate of Operations' operational and nonoperational files are kept in the same database, conflicts with her prior declarations, because she had previously represented that the CIA did not search for operational files on Fonzi.  *See* ECF No. 27-1 at 4–5.  If, they argue, both sets of files are stored in the same database and searched through the same interface, Shiner could not have been truthful when she said that the CIA did not search operational files on Fonzi.  *Id*.  In its reply, the CIA responds that there is no inconsistency between her two declarations, because "the CIA sought only non-operational files" pertaining to Fonzi and "its search was performed to locate potentially responsive non-operational files that may have existed within the database."  Third Supp'l Shiner Decl. ¶ 3.  The Court agrees that there is no contradiction, nor does Shiner's second supplemental declaration support an inference of untruthfulness.  That the two sets of files are in the same database does not imply that the CIA must have searched operational files when querying the database for records pertaining to Fonzi.  Indeed, in its prior opinion, the Court expected that the two sets of files may have been housed together.  *Hardway*, 384 F. Supp. 3d at 78.  Plaintiffs' objection on this point therefore fails.

Next, Plaintiffs argue that the scope of the CIA's search was unduly narrow.  The CIA determined that any records responsive to Plaintiffs' Requests A, D, E, F, or G would exist in the Directorate of Operations.  *See* Second Supp'l Shiner Decl. ¶ 11.  Plaintiffs disagree, arguing that the relevant records could be located in several different offices within the CIA.  *See* ECF No. 27-1 at 5–7.  But the Court already rejected this argument.  *Hardway*, 384 F. Supp. 3d at 77 n.3.

Plaintiffs, who largely reassert points already made in their prior motion, do not show "an intervening change in law" or that the Court's previous decision was "clearly erroneous and would work a manifest injustice." *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc)). And the one new argument they advance—that the CIA must also search records that were moved to the National Archives and Records Administration (NARA) under the President John F. Kennedy Records Collection Act of 1992, 44 U.S.C. § 2107 (note) (JFK Records Act)—is in any event unpersuasive. *See* ECF No. 27-1 at 7. Plaintiffs provide no reason to believe that the records at NARA would contain relevant documents, simply asserting in conclusory fashion that they "are likely to contain responsive records." *Id.* And Plaintiffs identify no legal basis to require the CIA to search for responsive documents in NARA's JFK Collection. Indeed, an agency need only search its *own* records in response to a FOIA request. *See Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131 (D.C. Cir. 2005) ("The FOIA requires disclosure only of 'agency records,' which are documents created or obtained by an agency and under the agency's control at the time the FOIA request is made."). And *Morley v. CIA*, 508 F.3d 1108, 1120 (D.C. Cir. 2007), on which Plaintiffs rely, holds only that the CIA cannot avoid searching its own records because copies of those records may be publicly available at NARA. *See id.* at 1119. Here, unlike in *Morley*, the CIA has not tried to invoke the existence of the JFK Collection to avoid searching its own records.

Third, Plaintiffs argue that the CIA's search terms were insufficient because they did not include the term "MHCHILD," which Plaintiffs allege was a code name for a CIA operation aimed at the HSCA. *See* ECF No. 27-1 at 5–6; ECF No. 30 at 6–7. But "[i]n general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *See Bigwood v. U.S.*

*Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015).  Plaintiffs argue that documents containing this term would likely be responsive to Request G, which seeks information about, among other things, "operations aimed at, targeting, related to or referring to the HSCA and any member of the HSCA or its staff."  Compl. ¶ 12.[2]  But even assuming that a CIA operation with that name existed, and that it did target, relate, or refer to the HSCA or any member of the HSCA or its staff, Plaintiffs have not explained why any responsive records would not have been captured by the searches the CIA undertook.[3]  *See* Second Supp'l Shiner Decl. ¶ 13; ECF No. 15-3 ¶¶ 18–19.  Because the CIA's search terms were "reasonably tailored to uncover documents responsive to the FOIA request" and Plaintiffs have not shown how the MHCHILD term could be expected to uncover additional responsive documents, this objection also fails.  *Bigwood*, 132 F. Supp. 3d at 140 (internal quotation omitted).

Fourth, Plaintiffs argue that the Court should not credit Shiner's assertion that none of the hits generated by the search of the Directorate of Operations were in fact responsive to their requests because of the "inherent contradictions" in her declarations as well as the CIA's alleged lack of credibility generally.  ECF No. 27-1 at 8.  The Court cannot agree.  As to Shiner

---

[2] Plaintiffs also argue that files about MHCHILD would be contained in records held outside the Directorate of Operations, and so the CIA should have searched the Office of Security for records responsive to Request G.  ECF No. 30 at 6.  But, as discussed above, the Court has already decided this issue in the CIA's favor.  Additionally, in responding to Plaintiffs' Request C, the CIA searched the Office of Security for any references to Plaintiffs, and the Court found this search to be adequate.  *Hardway*, 384 F. Supp. 3d at 74–77.

[3] For example, to the extent any responsive records were located in the Directorate of Operations' *operational* files—MHCHILD was, after all, purportedly an operation—Plaintiffs would not be entitled to them unless the record was about one of them.  *See* 50 U.S.C. § 3141(a), (c)(1).  And they have not explained why the CIA's searches using their names would not have uncovered all of them.  ECF No. 19-1 ¶ 12.  Similarly, to the extent any responsive records were located in its *nonoperational* files, Plaintiffs have not shown why the CIA's searches using their names, the name Gaeton Fonzi, or the terms "HSCA" and "House Select Committee on Assassinations" would not also have identified all of them.  ECF No. 15-3 ¶ 18–19.

specifically, the Court has already rejected Plaintiffs' argument that her declarations are

contradictory.  And as to the CIA generally, Plaintiffs do not provide any basis for the Court to

reconsider its prior holding that their argument relies on "historical conduct" insufficient to

disturb the presumption of good faith accorded the agency in this action.  *Hardway*, 384

F. Supp. 3d at 76 n.2.  In their renewed motion, Plaintiffs argue that the Court was "mistaken[]"

in so construing their argument, claiming that the alleged agency misconduct relates to "the

instant case" because it involves the subject matter underlying their FOIA request.  ECF No. 27-

1 at 8.  But Plaintiffs cite no authority for the proposition that decades-old alleged agency

misconduct can serve to negate the presumption of good faith afforded that agency in a FOIA

proceeding simply because the alleged misconduct is the subject matter of the FOIA request at

issue.  *See Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979);

*Assassination Archives & Research Center v. CIA*, 177 F. Supp. 2d 1, 11 (D.D.C. 2001) (finding

that the plaintiff's "statement that the CIA has previously acted improperly in withholding

information is insufficient to overcome the deferential standard afforded to agency affidavits").[4]

And the Court sees no reason why that should be so.

---

[4] In their reply brief, Plaintiffs argue that the CIA has misrepresented its conduct in the 1970s
involving the HSCA in *this litigation*.  *See* ECF No. 30 at 2–9.  But Plaintiffs have not shown
that the CIA lacked candor here.  Plaintiffs construe the CIA's response to their statement of
material facts, in which the CIA responded to each alleged fact by saying, "Disputed.  The
referenced document does not support the statement," as untruthful.  *Id.*; ECF No. 27-2
(Plaintiffs' statement of material facts); ECF No. 28-1 (Defendant's response to Plaintiffs'
statement of material facts).  However, that the CIA disputes Plaintiffs' characterizations of these
decades-old events—as well as Plaintiffs' interpretations of the CIA's own admissions about
them—is hardly grounds for the Court to conclude that the CIA has forfeited its presumption of
good faith.

For these reasons, the Court holds that the CIA performed an adequate search of the Directorate of Operations for records responsive to Plaintiffs' Requests A, D, E, F, and G. Thus, it will grant the CIA's motion for summary judgment on those claims.

### B.    Personnel Records

The CIA searched its Human Resources record systems for personnel files of Plaintiffs responsive to Request B.  Second Supp'l Shiner Decl. ¶ 14.  The Court previously found that the search was adequate in almost all respects, but for the fact that the agency once again did not affirmatively represent that "no other record system was likely to produce responsive documents."  *Hardway*, 384 F. Supp. 3d at 78 (quoting *Oglesby*, 920 F.2d at 68).  The Court noted that it was especially hesitant to grant summary judgment without this information, because Plaintiffs sought records from the 1970s which may not have been housed in the electronic database the agency searched.  *Id.*  In its renewed motion, the CIA represents that hard-copy personnel records from the 1970s would have been transferred to the National Personnel Records Center within NARA "upon the employee's separation from the agency," but that the human resources electronic system maintains "certain information" about former employees for records purposes.  Second Supp'l Shiner Decl. ¶¶ 14–15.  Shiner explains that no records of Plaintiffs were found in the electronic system, which "was the expected result of the search, as the plaintiffs were never employees of the CIA (and do not claim to have been)."  *Id.* ¶ 14.  Because Plaintiffs were not CIA employees and no references to them were found in the agency's human resources database, Shiner avers that "there is no indication that any personnel records pertaining to the plaintiffs were ever created (in hardcopy or electronic form), and "there are no other CIA records systems that are reasonably likely to contain personnel files pertaining to the plaintiffs."  *Id.* ¶ 15.

In their cross-motion, Plaintiffs do not challenge the adequacy of the CIA's search of its personnel records. *See generally* ECF No. 27-1; ECF No. 30. And having received the CIA's explanation that it does not create personnel files for legislative branch employees who interact with the CIA and its representation that "there are no other CIA records systems that are reasonably likely to contain personnel files pertaining to the plaintiffs," the Court is satisfied that its search of its personnel files for records responsive to Request B fulfilled its obligations under FOIA. Second Supp'l Shiner Decl. ¶ 15; *Oglesby*, 920 F.2d at 68. For these reasons, the Court will grant the CIA's motion for summary judgment with respect to Plaintiffs' Request B.

### C.    Records of Search

Finally, Plaintiffs requested all records about the CIA's search efforts relating to the other categories of records they requested. Compl. ¶ 12. The parties dispute on this issue turns on the search cut-off date used by the CIA. FOIA requires agencies to search for records only as of a specific cut-off date. *See Kissinger v. Reporters Comm. For Freedom of the Press*, 445 U.S. 136, 152 (1980). The D.C. Circuit "has indicated that an agency must have a 'compelling justification for imposing a date-of-request cut-off on a particular FOIA request.'" *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 141 (D.D.C. 2017) (quoting *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002)). But courts in this Circuit have repeatedly held that a date-of-*search* cut-off is reasonable. *See id.* (collecting cases).

The Court previously denied summary judgment as to Plaintiffs' Request H because it could not determine whether the CIA had used a date-of-request or date-of-search cutoff. *Hardway*, 384 F. Supp. 3d at 79. Now, the CIA explains that it used the date it began its search process as the cut-off date—and that its search "included multiple steps: (1) efforts to identify file locations and record systems where responsive records may be located, (2) legal consultations concerning requirements under FOIA pertaining to the scope of the CIA's

searches, (3) crafting search terms for use within electronic databases, (4) executing the searches

to locate and compile potentially responsive records, and (5) reviewing potentially responsive

records to determine whether individual records were actually responsive" to Plaintiffs' request.

Second Supp'l Shiner Decl. ¶¶ 16–17.  Thus, as the CIA argued in its initial motion for summary

judgment, it did not search for any such records because none could have existed at the moment

the search began.  *Id.* ¶ 17.

Plaintiffs say this interpretation of "search" is too broad and argue that the CIA's

approach would collapse any meaningful distinction between a date-of-search cutoff and a date-

of-receipt cutoff.  *See* ECF No. 30 at 9–10.  They are incorrect, insofar as there could well have

been a gap in time between when the CIA received the request and when it began its search

process.  But they are right that the CIA's approach would mean that here—where Plaintiffs have

requested records about the very process the agency undertook to respond to *other* components

of their FOIA request—the CIA would not have to search for any such records because by

definition, none could have existed when the "search" began.  Instead, Plaintiffs say, the Court

should require the CIA to identify the dates when it actually ran search terms against its

databases, deem one of those the date the search occurred, and require the CIA to use *that* as the

cut-off date.  *Id.*

But the ultimate question the Court must decide is merely whether the cut-off date used

by the CIA here was reasonable.  *See McClanahan v. U.S. Dep't of Justice*, 204 F. Supp. 3d 30,

47 (D.D.C. 2016).  The Court finds that it was.  First, for the reasons explained above, the CIA's

cut-off date was not linked to the date of Plaintiffs' request, but the commencement of its search

process, so under Circuit precedent the CIA need not show any "compelling justification" for it.

*Pub. Citizen*, 276 F.3d at 644; *see Ctr. For Biological Diversity*, 279 F. Supp. 3d at 141.  And

second, the cut-off date used by the CIA in this circumstance—that is, in connection with a request for records about its own search process for records responsive to the same FOIA request—accords with the general principle that the FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger*, 445 U.S. at 152.  Any other approach could result in an end-run around this rule by effectively requiring the CIA to create and retain records it might not have otherwise.

Another court in this District came to a similar conclusion in *Schoenman v. FBI*, 573 F. Supp. 2d 119 (D.D.C. 2008).  In that case, a requestor similarly sought "copies of records documenting the State Department's search in response to his request." *Id.* at 139.  The agency did not provide them because it deemed records created after the search for responsive records was initiated outside the scope of the FOIA request. *Id.*  The court agreed that approach was reasonable. *Id.* at 140.  To be sure, that case involved an agency regulation mandating that "[d]ocuments which are created after the date the search for responsive records is initiated[ ] are deemed outside the scope of plaintiff's FOIA request," and in this case, in urging that its approach was reasonable, the CIA relies on no such regulation. *Id.* at 139.  But the court also held that the plaintiff's request conflicted with the purposes and requirements of the FOIA, in particular, that the statute does not require agencies to "create or maintain" documents. *Id.* at 140.  And, implicitly, it adopted the CIA's position here that a search can reasonably be considered a process—and not merely the moment when search terms are applied to a particular database—when it blessed the agency's refusal to search for "documentation that may or may not exist but which, in any event, was created *during the course of searching* for records responsive to Plaintiff's FOIA request." *Id.* (emphasis added).

For these reasons, the Court will grant summary judgment for the CIA as to Request H. Of course, the CIA has now completed processing the Plaintiffs' request and there may well be documents it has created and retained that are responsive to Request H.  Plaintiffs are free to file a new FOIA request for any such documents.

## IV.    Conclusion

For all the above reasons, Defendant's Renewed Motion for Summary Judgment, ECF No. 25, will be granted and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 27, will be denied.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 18, 2020